In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2414

Lisa Worth,

Plaintiff-Appellee,

v.

Robert H. Tyer II, United States Title &
Abstract Company, Grundy County
Title & Abstract, Inc., Consolidated
Title Services Company of Illinois, Ogle
County Title & Abstract Company II, Title
Express Company, Ltd, and Grundy County
Title & Abstract Company II,

Defendants-Appellants.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 96 C 3539--Blanche M. Manning, Judge.

Argued April 12, 2001--Decided December 27, 2001


  Before Flaum, Chief Judge, and Manion and
Kanne, Circuit Judges.

  Kanne, Circuit Judge.  After being
terminated, plaintiff, Lisa Worth
("Worth"), sued defendants, charging that
they had violated Title VII of the Civil
Rights Act of 1964, 42 U.S.C. sec. 2000e
et seq., and that her supervisor had
committed a battery in violation of state
tort law. The jury found for Worth and
awarded $52,500 in compensatory and
punitive damages for the Title VII claims
and $100,000 in compensatory and punitive
damages for the battery. Defendants
appeal, alleging that the district court
erred in denying their motion for
judgment as a matter of law or, in the
alternative, their post-trial motion to
amend the verdict or for a new trial.
Defendants also claim that the district
court lacked jurisdiction over Worth's
claims. We affirm in part and reverse in
part.
I.  History

  Individual defendant, Robert H. Tyer, II
("Tyer"), is significantly involved with
defendant corporations, all of which are
real estate title companies incorporated

in Illinois. Tyer is the sole director of Grundy County Title & Abstract, Company II ("Grundy II"). Grundy II was incorporated in 1983 and, although the corporation still exists, Grundy II ceased all operations on December 31, 1994. While Grundy II operated, Tyer managed its offices and divisions. Grundy II's divisions that are relevant to this litigation are the United States Title Insurance Company division and the Title Express Company division.

Tyer is the president and sole director of defendant Ogle County Title & Abstract Company II ("Ogle II"). Ogle II has two divisions relevant to this litigation: United States Title Insurance Company division and the Title Express Company division. On January 2, 1995, after Grundy II had ceased operations, Ogle II hired all of Grundy II's former employees and acquired Grundy II's assets.

Tyer owns defendant United States Title and Abstract Company ("U.S. Title Co."), which ceased operations in 1993. Tyer was president of defendant Consolidated Title Services Company ("CTS"), which ceased operations in 1989. Tyer is the COO and president of defendant Title Express Company, Ltd. ("Title Express"), which ceased operations in 1998.

In early 1994, Worth worked as a paralegal for a law firm in Joliet, Illinois. Worth first contacted Tyer by telephone in conjunction with a real estate closing on which they were both working. During that phone call, Worth asked Tyer if there were any positions available within his company. Tyer suggested that she fax a resume to his attention. On April 21, 1994, Worth faxed Tyer a resume in care of "U.S. Title." After reviewing the resume, Tyer indicated to Worth that he was looking for someone to increase business in Joliet. Worth then faxed over a supplemental resume outlining her previous car sales experience.

In early May 1994, Tyer and Worth met to discuss employment opportunities. Tyer offered to pay Worth $700 twice a month for her services. Worth accepted Tyer's offer and was told to report to the Morris, Illinois Office of the U.S. Title division of Grundy II ("Morris Office"). On May 23, 1994, Worth arrived at the

Morris Office and met Lisa Fahrion, one of the office managers. Worth trained under Fahrion for several weeks and developed a promotional flyer. During this training period, Tyer was never in the office, although he was present at the Morris Office on June 13, 1994. On the evening of June 14, 1994, Tyer and Worth met in Worth's office to review some documents. During this meeting, Tyer touched Worth's breast. The circumstances surrounding this incident gave rise to Worth's battery claim.

On June 15, 1994, Worth went to the Morris Police Department and filed a police report concerning Tyer's alleged battery. The next morning, Morris Police Detective Salemas contacted Tyer regarding Worth's report. Later that day, Tyer informed Worth that "in light of recent circumstances," he was terminating her "independent contractor's" status.

On December 9, 1994, Worth filed a charge of employment discrimination with the Illinois Human Relations Commission ("IHRC"), a copy of which was forwarded to the EEOC. On December 15, 1994, the IHRC sent an inquiry letter to "Robert Tyler III [sic] care of U.S. Title & Abstract Company/Grundy Title & Abstract [sic]," requesting information regarding Worth's charges. On January 15, 1995, Tyer called the IHRC and stated that he had just received the letter. He was granted an extension to respond. On February 20, 1995, Tyer responded to the IHRC inquiry letter by stating that Worth was not an employee of "U.S. Title," but rather, she was an independent contractor employed by Grundy II, which had recently ceased operations. On June 12, 1996, Worth filed suit in the United States District Court for Northern Illinois, alleging several Title VII counts, one count of battery, and other state law claims.

At trial, Worth testified that she inquired about an employment position with Tyer and faxed him a resume in care of "U.S. Title"--the company that she believed he represented. She then faxed supplemental information to Tyer in care of "United States Title Insurance Company" concerning her prior work in sales. Worth and Tyer eventually met to discuss possible employment at an office for "U.S. Title." No job offer was made

at this time, but soon thereafter, Tyer contacted Worth about starting work in late May. Worth testified that due to her lack of knowledge concerning the title business, Tyer told her that the job would initially entail training on title searches, closings paperwork, and other tasks relevant to the title business. In discussing the job, Worth stated that Tyer told her that there were definite career advancement possibilities including a position in office management. Worth accepted the position and Tyer told her to report to Fahrion, the office manager of the Morris Office, to begin training. On May 23, 1994, Worth started work at the Morris Office and spent most of her time training with Fahrion. Among other things, the training included one visit to the Schaumburg Office of Title Express, a Grundy II affiliate, in order to view a closing.

Worth testified that she was required to give a timecard to Fahrion every week in order to receive her paycheck. Tyer later testified that the same timecard was given to every Grundy II employee and that the independent contractors Tyer had hired in the past had never used timecards. Worth admitted that she did not have withholdings from her paycheck, nor did she receive any insurance, sick leave, or vacation time. Worth testified that Tyer refused to take out withholdings, or give her benefits, for thirty days because his corporations were experiencing financial difficulties.

Worth testified that during the time not taken up with training, she worked with Fahrion on a promotional flyer for the "United States Title Insurance Company." Worth stated that she was in charge of composing the cover letter to accompany the flyer. To compose the letter, Fahrion gave Worth a form letter to use as a template. Worth testified that her cover letter was eventually sent to Tyer, who gave his approval. Worth then sent prospective clients the cover letter and flyer, using letterhead for the cover letter that stated "United States Title Insurance Company, also authorized to do business as United States Title & Abstract Company." Worth testified that Fahrion gave her the letterhead and that everyone in the office used that particular letterhead.

Worth next testified about the circumstances that gave rise to the suit. On June 13, 1994, Tyer came into Worth's office late in the afternoon. According to Worth, Tyer then placed his hands on her shoulders and neck and massaged her for several minutes. Worth testified that this made her uncomfortable. The next morning, while Worth was making copies, Worth stated that Tyer approached her and stroked her hand, and made a comment regarding how office work must be hard on her fingernails. Worth testified that she found this conduct inappropriate and that it made her uncomfortable. At approximately 4:45 p.m. that afternoon, Tyer came into Worth's office to discuss a project on which she was working. Worth stated that Tyer brushed up against her dress and then sat down beside her and began staring at her breasts. Tyer then asked for a computer disk that was in Worth's car. Because the office doors were locked, Tyer unlocked the doors for Worth to leave, and after retrieving the disk, she returned to her office. Worth stated that while she loaded the disk onto the computer in her office, Tyer again came up alongside her and stroked her face, hair, and nose and commented on her sunburn. Further, Worth testified that Tyer stuck his hand down her dress and placed it directly onto her breast. According to Worth, Tyer placed his hand approximately one inch away from her nipple and kept it there for several seconds. Worth testified that she was shocked and made an excuse to leave immediately. Tyer then followed her out of her office. Worth stated that as she was leaving the Morris Office, Tyer stroked her back side and leg. Worth testified that she had difficulty sleeping that night.

Worth further testified that on June 15, 1994, she went to the Morris Office and attempted to work but was unable to concentrate due to Tyer's conduct the previous day. At around noon, Worth stated that she left the office and went to the Morris Police Department to report Tyer's actions. Worth returned to the office later that afternoon, after she finished speaking with Morris Police detectives and at the end of the work day, she went home. The next morning, Worth testified that she called Fahrion to tell her that she was not coming into the office because she did not want to

have any contact with Tyer. Later that morning, Worth stated that Tyer spoke with her on the phone and stated that "in light of the recent circumstances," he was going to terminate her "independent contractor's" status. Worth testified that she had never heard Tyer say the phrase "independent contractor" before this conversation. On cross-examination, Worth testified that she was never explicitly told whether she was an employee or an independent contractor, but assumed that she was an employee due to her duties and the nature of her work.

Worth testified that after being fired, she had headaches and could not sleep. She stated that it took her eight weeks to secure new employment. Finally, Worth testified that in April 1995, she received a tax form for her work at the Morris Office. She stated that she did not understand the significance of the tax form and that she took the form to H&R Block, who completed all of her tax paperwork.

Tyer also testified at trial. Initially, his testimony focused on the incorporation and management of the defendant corporations. Tyer testified that the corporations were incorporated independently and proper corporate formalities were observed at all times. For instance, Tyer testified that he maintained separate corporate records, minute books, and tax returns for each corporate defendant. Tyer also stated that he never "commingled the records or bills" of any of the companies.

In addressing the alleged battery, Tyer admitted touching Worth's breast on June 14, 1994, and being contacted by Morris Police Detective Salemas on the morning of June 16, 1994. Tyer testified that on June 16, 1994, he lied to Detective Salemas and denied touching Worth. Tyer also admitted repeatedly lying in the pleadings by denying that he touched Worth's hair, breast, body or made any comments to Worth regarding the same. Tyer testified that thirteen days before trial, he amended the pleadings to reflect the truth.

Tyer further testified that he had made the decision to terminate Worth before meeting with her on June 13, 1994, because of Worth's substandard job

performance. Tyer stated that she had made many mistakes with respect to the flyer and cover letter. Tyer was also dissatisfied with stylistic aspects of her work such as the use of "Dear Sir" in the greeting instead of the addressee's name. However, Tyer admitted that he had authorized a similar flyer four months prior to Worth's flyer. Tyer testified that he told Worth not to mail the promotional flyer because he did not approve of it. In addressing her termination, Tyer denied that the incorrect letterhead played a large part in Worth's dismissal. Tyer's testimony was impeached, however, when his deposition testimony was read into the record. In his deposition, Tyer stated that he dismissed Worth "in large part" because she used improper letterhead. On cross-examination, Tyer admitted that another employee had used incorrect letterhead for three years without being terminated.

At the close of testimony, defendants filed a motion for judgment as a matter of law ("JMOL") alleging: (1) U.S. Title Co., CTS, Title Express, Ogle II, and Tyer in his individual capacity were improper defendants under Title VII; (2) all Title VII claims should be dismissed because Worth was an independent contractor; (3) Worth failed to establish a retaliatory discharge claim; (4) the Morris Office was not hostile; (5) Tyer did not engage in quid pro quo harassment; and (6) all state law claims except the battery should be dismissed. The district court dismissed all of the state law claims except the battery and also dismissed Worth's quid pro quo claim. The district court found there was sufficient evidence to submit the other issues to the jury. Therefore, the claims that survived the motion, and form the basis of this appeal, were two Title VII counts--one for sexual harassment and one for retaliatory discharge--and one count of battery.

The jury returned a verdict against defendants in the amount of $52,000 in compensatory and punitive damages for the Title VII claims. The jury also returned a verdict against defendants in the amount of $100,000 in compensatory and punitive damages for the battery. Defendants then moved to amend the judgment, or in the alternative for a new

trial under Federal Rules of Civil Procedure 59(a) and 59(e). In this motion, defendants alleged that (1) there was insufficient evidence to find U.S. Title Co., CTS, Title Express, Ogle II, or Tyer in his individual capacity proper defendants under Title VII; (2) the retaliatory discharge claim should not have been submitted to the jury; (3) there was insufficient evidence to support the hostile work environment claim; and (4) the damages were excessive. The district court denied defendants' motion, and judgment was entered against Grundy II, U.S. Title Co., CTS, Title Express, Ogle II and Tyer.

## II. Analysis

### A. Jurisdiction

On appeal, defendants contend that the district court lacked subject matter jurisdiction over Worth's claims. Defendants rely on the fact that when Worth filed her complaint on June 12, 1996, she lacked a Notice of Right to Sue from the EEOC ("right-to-sue letter"). Defendants assert that a plaintiff must obtain a right-to-sue letter to satisfy the jurisdictional prerequisites of Title VII. According to defendants, any plaintiff who lacks a right-to-sue letter at the time of filing its lawsuit can have its suit dismissed at any point thereafter for lack of jurisdiction. Therefore, defendants contend that the district court should have dismissed Worth's Title VII claim for lack of jurisdiction. See Movement for Opportunity & Equal. v. Gen. Motors, Corp., 622 F.2d 1235, 1241 (7th Cir. 1980). Moreover, because the district court lacked original jurisdiction over Worth's Title VII claims, defendants argue that it also lacked supplemental jurisdiction over Worth's battery claim. See 28 U.S.C. sec. 1367. Finally, defendants contend that this issue has been preserved for appeal because jurisdictional arguments may never be waived. See Fed. R. Civ. P. 12(h)(3).

Defendants' argument fails because the receipt of a right-to-sue letter is not a jurisdictional prerequisite to bringing a Title VII suit. See Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 398, 102 S. Ct. 1127, 71 L. Ed. 2d 234 (1982).

Rather, the lack of a right-to-sue letter may constitute a defense to a Title VII claim. See Perkins v. Silverstein, 939 F.2d 463, 471 (7th Cir. 1991). In Perkins, we held that a complaint may be deficient and subject to dismissal if the plaintiff lacks a right-to-sue letter. See id. However, the plaintiff's receipt of a right-to-sue letter before dismissal cured any deficiency in the original complaint. See id.

In the present case, the EEOC sent Worth a right-to-sue letter on October 21, 1996. Thus, defendants could have sought to dismiss Worth's complaint at any time before October 21. See id. However, it was defendants' duty to bring any deficiency in Worth's complaint to the court's attention and they failed to do so in a timely manner. Therefore, defendants' argument fails because it was not raised before Worth received the October 21, 1996 right-to-sue letter. See id.

B.  Proper Defendants

a.  Corporate Defendants

At the close of testimony, defendants moved for JMOL, alleging that U.S. Title Co., CTS, Title Express, and Ogle II ("Affiliates") were not proper defendants under Title VII. The district court found there was sufficient evidence to submit the question to the jury, which returned a verdict against defendants. Defendants then moved to amend the judgment, or in the alternative, for a new trial on the same grounds. Their post-trial motion was again denied. "While we review the denial of a motion for judgment as a matter of law de novo . . . we are limited to assessing whether no rational jury could have found for the plaintiff." Goodwin v. MTD Prods., Inc., 232 F.3d 600, 605-06 (7th Cir. 2000). Further, "[w]e review the denial of a motion for a new trial for abuse of discretion." Harris v. City of Chicago, 266 F.3d 750, 753 (7th Cir. 2001).

In the present case, there are three ways in which one of the Affiliates could be found to be a proper Title VII defendant. First, any of the Affiliates that possibly maintained an employment relationship with Worth may be named as a defendant under Title VII. See Knight v.

United Farm Bureau Mut. Ins. Co., 950 F.2d 377, 380 (7th Cir. 1991). Affiliates deny they are defendants under this stan dard, although Grundy II concedes that it is a proper defendant for this reason. Next, if any of the Affiliates forfeited its limited liability, it is a proper defendant under Title VII. See Papa v. Katy Ind., Inc., 166 F.3d 937, 941 (7th Cir. 1999). The most common way for an affiliated corporation to forfeit its limited liability is through "piercing the corporate veil," whereby corporate formalities are ignored and the actions of one company can accrue to another. See id. Worth must show two things to pierce the corporate veil of each Affiliate: first, "there must be such unity of interest and ownership [between the Affiliate and Grundy II] that the separate personalities . . . no longer exist; and second, circumstances must be such that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." Van Dorn Co. v. Future Chem. & Oil Corp., 753 F.2d 565, 569-70 (7th Cir. 1985) (quotation omitted). An affiliated corporation also forfeits its limited liability when it takes actions for the express purpose of avoiding liability under the discrimination laws or where the affiliate corporation might have directed the discriminatory act, practice, or policy of which the employee is complaining. See Papa, 166 F.3d. at 941. Finally, any of the Affiliates may be liable under Title VII due to the misdeeds of a predecessor through successor liability. "When the successor company knows about its predecessor's liability, knows the precise extent of that liability, and knows that the predecessor itself would not be able to pay a judgment obtained against it, the presumption should be in favor of successor liability . . . ." EEOC v. Vucitech, 842 F.2d 936, 945 (7th Cir. 1988). If any of the Affiliates satisfy any of these scenarios, it is a proper defendant under Title VII.

Worth contends that there is a fourth way Affiliates could be proper Title VII defendants: through the "integrated enterprise" test. The "integrated enterprise" test determines whether multiple corporate entities could both be considered proper defendants in employment discrimination cases even if

one of them did not directly employ the plaintiff./1 See, e.g., Rogers v. Sugar Tree Prods., Inc., 7 F.3d 577, 582 (7th Cir. 1993). Worth's argument fails, however, because this Circuit no longer applies the "integrated enterprise" test to Title VII claims. See Papa, 166 F.3d at 941-43. In Papa, we addressed the application of the "integrated enterprise" test in the context of determining whether affiliated corporations were proper defendants under Title VII even if they did not meet the minimum employee requirements of Title VII ("tiny employer exception"). See id. at 939. We stated that the "integrated enterprise" test was too amorphous to be applied consistently. See id. at 940-42. Such inconsistencies made it difficult for a corporation to determine when it could be held liable for the actions of its affiliate. Therefore, we held that the "integrated enterprise" test should be abrogated in Title VII cases. See id. at 941-43.

Worth erroneously contends that because Papa addressed only the tiny employer exception, it is limited to such cases. Therefore, according to Worth, we should still apply the "integrated enterprise" test in this case because, Worth alleges, defendants meet the minimum employee requirement of Title VII. However, nothing in Papa limits its application to the tiny employer context. Rather, we stated that the principles governing affiliate liability should apply "across the full range of American law" unless a particular statute provided an alternative test. Id. at 941.

Turning to the each of the Affiliates, Ogle II is proper defendant due to successor liability. See Vucitech, 842 F.2d at 943-45. There was ample evidence for the district court to conclude that Ogle II knew about the existence and extent of Grundy II's liability to Worth and that Grundy II was no longer operating. See id. at 945. Tyer's conduct is what gives rise to any liability against Grundy II and Tyer knew that, when he terminated Worth, she had already reported his conduct to the police. Therefore, he knew that Grundy II was potentially liable for his actions./2 On December 31, 1994, twelve days after the IHRC sent Tyer a letter with respect to this matter, Grundy II ceased

operations. Two days later, on January 2, 1995, every employee of Grundy II became an employee of Ogle II and Ogle II acquired Grundy II's assets. Finally, and most importantly, defendants' counsel conceded at trial that Ogle II should be liable for any judgment against Grundy II. Therefore, the district court did not err in holding that Ogle II was a proper defendant under Title VII.

However, there was insufficient evidence that Title Express was a proper defendant. Although Worth briefly visited the Schaumburg Office of Title Express, she did so only in her capacity as a representative of Grundy II. Title Express did not pay Worth nor establish any sort of relationship with Worth. Therefore, Title Express did not employ Worth. See Knight, 950 F.2d at 380. Further, Worth was unable to show that piercing Title Express' corporate veil was necessary to avoid fraud or prevent injustice. See Sea-Land Servs., Inc. v. Pepper Source, 941 F.2d 519, 522 (7th Cir. 1991). Additionally, there was no evidence that Title Express was set up for the purpose of avoiding liability under the anti-discrimination law or that it directed any of the discriminatory acts in question. See Papa, 166 F.3d at 941. Finally, Worth did not present any evidence that Title Express succeeded Grundy II in interest. See Vucitech, 842 F.2d at 943-45. Therefore, Title Express was not a proper defendant under Title VII.

U.S. Title Co. and CTS both ceased operations by May 1994 and, therefore, neither directly employed Worth. See Knight, 950 F.2d at 380. Moreover, neither U.S. Title Co. nor CTS succeeded Grundy II in interest so neither is liable due to successor liability. See Vucitech, 942 F.2d at 943-45. Further, Worth presented no evidence that U.S. Title Co. or CTS directed Tyer's misdeeds. See Papa, 166 F.3d at 941. Worth did not establish that piercing the corporate veil was necessary to avoid fraud or the promotion of injustice. See Sea-Land, 941 F.2d at 522. Worth presented no evidence that when U.S. Title Co. was incorporated in 1974, it was set up to avoid liability under the antidiscrimination laws. See Papa, 166 F.3d at 941. Nor did Worth present any evidence that CTS was incorporated in

1983 in order to avoid the same liability. Therefore, U.S. Title Co. and CTS were also improper defendants under Title VII. To summarize, the district court was correct to conclude that Grundy II and Ogle II were proper defendants under Title VII. However, the court erred in finding U.S. Title Co., CTS, and Title Express to be proper defendants. Therefore, we hold that the district court erred in denying defendants' motion for JMOL as far as it applies to those three corporations under Title VII.

b. Tyer

Tyer contends that the district court erred in denying defendants' motion for JMOL because supervisors are not liable in their individual capacities under Title VII. See EEOC v. AIC Sec. Investigations, Ltd., 55 F.3d 1276, 1279 (7th Cir. 1995). Worth assets that Tyer is not liable as a supervisor, but rather because he is an "alter ego" of the defendant corporations, he should be treated as Worth's employer under Title VII. See Curcio v. Chinn Enters., Inc., 887 F. Supp. 190, 193-94 (N.D. Ill. 1995) (holding that because defendant was sole shareholder and main decisionmaker of corporation he was liable in individual capacity as "alter ego" of corporation). According to Worth, Tyer--as the maindecisionmaker and controlling shareholder of Grundy II and Ogle II/3--is so intertwined with them that he is their "alter ego." Because Tyer is the corporations' "alter ego," Worth contends that Tyer should be treated as her actual employer for Title VII purposes. See id. at 194.

We disregard the presumption of shareholder protection from individual liability only in limited circumstances. See Van Dorn, 753 F.2d at 569-70. To overcome this presumption, a party must show, in addition to the interrelation of a corporation and its shareholders, that the protection must be disregarded in order to prevent fraud or the promotion of injustice. See id. at 570. The problem with the "alter ego" theory is that it seeks to impose liability upon shareholders without a showing of fraud or injustice. See AIC Sec., 55 F.3d at 1282 n.11 (suggesting that we would not adopt "alter ego" theory because shareholder is already potentially liable

through veil piercing). Our rejection of the "alter ego" theory is further supported by Congress' aversion to individual liability under Title VII. See, e.g., id. at 1279-82. In the present case, Worth presented no evidence that Tyer should be liable in his shareholder capacity. Therefore, the district court erred in denying defendants' motion for JMOL as it relates to Tyer under Title VII. We are then left with Grundy II and Ogle II as proper defendants under Title VII.

## C. Sufficiency of the Evidence

Defendants contend the evidence was insufficient to establish (1) that Worth was an employee and, thus, covered under Title VII; (2) that Worth was terminated for statutorily protected expression; and (3) that Worth's work environment was hostile.

### a. Independent Contractor or Employee

Defendants assert that Worth was an independent contractor and not one of their employees. Because independent contractors are not protected under Title VII, see Knight, 950 F.2d at 380, defendants assert that the district court erred in denying their motions for judgment as a matter of law or, in the alternative, for a new trial. Defendants contend that the district court misapplied the applicable law, and therefore, we should determine whether Worth was an employee de novo. See Daniels v. Essex Group, Inc., 937 F.2d 1264, 1269-70 (7th Cir. 1991). Defendants' contention is mistaken, however, as the district court examined, applied, and commented on the proper test. Because the district court did not misstate, misinterpret or misapply the law, we apply the clear error rule because defendants take issue with the trial judge's view of the evidence, not with her view of the law. See Daniels, 937 F.2d at 1270./4

To determine whether an individual is an employee or an independent contractor within the meaning of Title VII, we focus on five factors:

(1) [T]he extent of the employer's control and supervision over the worker, including directions on scheduling and

performance of work, (2) the kind of occupation and nature of skill required, including whether skills are obtained in the workplace, (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations, (4) method and form of payment and benefits, and (5) length of job commitment and/or expectations.

Knight, 950 F.2d at 378-79. The employer's right to control the worker's actions is the most important factor. See id. at 378. "If an employer has the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist." Spirides v. Reinhardt, 613 F.2d 826, 831-32 (D.C. Cir. 1979).

On appeal, defendants contend that an incident on the afternoon of June 15, 1994 demonstrates that Worth, not defendants, controlled Worth's actions. That afternoon, Worth left the office around lunch and did not return until late in the afternoon. Defendants point to this incident to show that Worth was in control of her own work and schedule because she was free to come and go as she pleased. Moreover, defendants assert that this incident is conclusive proof of Worth's independent contractor status because, unlike employees, independent contractors can set their own schedule. See Knight, 950 F.2d at 380 (noting that individual's control over own work schedule indicative of independent contractor status).

Worth presented significant evidence that defendants controlled her actions and dictated her schedule through either Tyer or Fahrion. Worth testified that Fahrion--acting under Tyer's orders--set Worth's training schedule and that training accounted for most of Worth's workday. Worth further stated that in addition to setting Worth's schedule, either Fahrion or Tyer directed Worth's job duties by telling her on which projects to work. Tyer also required Worth to submit her work on the promotional flyer to him for his approval. Finally, Worth testified that she was required to submit an employee timecard to Fahrion. Tyer admitted that

all Grundy II employees filled out similar timecards and that independent contractors he had hired in the past had not been required to fill out timecards.

Defendants next contend that Worth's previous sales experience indicates that she was an independent contractor possessing unique sales skills. An individual's unique work skills may indicate independent contractor status. See Spirides, 613 F.2d at 832. However, if the individual requires substantial training and supervision, an employee/ employer status is more likely. See Knight, 950 F.2d at 380. In the present case, Worth did not dispute that she had previous sales experience. However, she contends that most people bring some sort of skills to a new job and there was nothing unique about her experience. Moreover, she testified that most of her day consisted of training.

The party that bears the costs of operation is also relevant to our determination. See id. If an entity bears costs of operation--such as for equipment or office space--an employee/employer relationship is more likely. See Ost v. W. Suburban Travelers Limousine, Inc., 88 F.3d 435, 438 (7th Cir. 1996); Spirides, 613 F.2d at 832. In the present case, there was no dispute that Grundy II bore the costs of operation involved in Worth's work.

Turning to the method of payment and benefits, defendants assert that Worth's tax return shows that she was an independent contractor. Whether an individual is paid by time or by commission is indicative of the individual's status. See Spirides, 613 F.2d at 832. Further, whether the entity pays the appropriate taxes--such as FICA or Social Security--and gives the individual benefits must also be considered. See id. Defendants rely on Worth's 1994 tax return, which listed Worth's income from Grundy II as "free lance" work, for its assertion that Worth was an independent contractor./5 Defendants note that Worth did not have taxes taken out of her paycheck or receive any insurance, sick leave, or vacation time.

Worth testified that she never characterized her employment as "free

lance" work. Rather, H&R Block prepared her tax returns that year and reached that conclusion itself. Worth further testified that she never told H&R Block that she was doing free lance work. Defendants attempted to rebut this testimony by showing that Worth's previous work experience showed that she was familiar with employee forms. Finally, Worth testified that although she did not have taxes taken out of her paycheck, or receive benefits, she believed that both events would occur within the thirty days.

Finally, we turn to the parties' expectations regarding the length of Worth's employment. Contracts of a set length often indicate independent contractor status. See Mazzei v. Rock N Around Trucking, Inc., 246 F.3d 956, 965 (7th Cir. 2001). Defendants concede that both Tyer and Fahrion repeatedly discussed career advancement with Worth. Defendants asserts that advancement in this context meant a change from independent contractor status to employee status. Worth testified that Tyer told her that, eventually, she might be promoted into office management.

We conclude that the district court did not err in denying defendants' motions, see Daniels, 937 F.2d at 1270, because all five Knight factors cut in Worth's favor. Grundy II, through Tyer and Fahrion, controlled all of Worth's work actions by setting her hours, assigning her projects and approving her work. See Spirides, 613 F.2d at 831–32; see also Knight, 950 F.2d at 380. Worth also lacked unique work skills, relevant to defendants' business. See Spirides, 613 F.2d at 632. Defendants provided all the costs of operation for Worth's work, see Ost, 88 F.3d at 438, and Tyer and Worth discussed the possibility of being promoted. Further, Worth had to submit a time card and was not paid a sales commission. See id. Therefore, there was sufficient evidence for the jury to conclude that Worth was an employee.

b.  Retaliatory Discharge

Defendants next contend that the evidence at trial was insufficient for Worth to establish a claim of retaliatory discharge under Title VII and, therefore, the district court erred in not granting

their motions for JMOL or a new trial. To establish a prima facie case of retaliation under Title VII, Worth "must show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse action by her employer; and (3) there [was] a causal link between her protected expression and the adverse action." Sweeney v. West, 149 F.3d 550, 555 (7th Cir. 1998). If Worth established these elements, the burden would shift to defendants to produce a legitimate, non-discriminatory reason for firing her. See Miller v. Am. Family Mut. Ins. Co., 203 F.3d 997, 1007 (7th Cir. 2000). If defendants succeeded in producing a legitimate justification, the burden would shift back to Worth to prove that the reason was a mere pretext for retaliating against her. See id.

Defendants contend that Worth failed to show that she engaged in statutorily protected expression, relying on the fact that Worth was fired long before she filed her EEOC complaint. Defendants further assert that Worth's filing of the police report does not constitute statutorily protected expression under Title VII because, according to defendants, the only type of activity protected by the statute is the filing of a Title VII complaint. We disagree.

In relevant part, Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter . . . ." 42 U.S.C. sec. 2000e-3(a). Among other things, Title VII prohibits employers from retaliating against employees who "oppose" sexual harassment. See Rennie v. Dalton, 3 F.3d 1100, 1109 (7th Cir. 1993). Moreover, we have previously held that sexual contact may constitute sexual harassment. See Hostetler v. Quality Dining, Inc., 218 F.3d 798, 807 (7th Cir. 2000). A plaintiff that reports such conduct to the police clearly "opposes" it within the meaning of 42 U.S.C. sec. 2000e-3(a). In the present case, Worth's police report alleged that Tyer touched her breast while she was in her office. We have no problem concluding that Worth's police report constitutes protected activity under Title VII's "opposition" clause. See EEOC v. Dinuba Med. Clinic,

222 F.3d 580, 586 (9th Cir. 2000) (holding that filing of assault and battery police report constitutes statutorily protected expression).

Turning to the second prong, there is no question that termination constitutes an adverse action under Title VII. See Silk v. City of Chicago, 194 F.3d 788, 800 (7th Cir. 1999). In addressing the third prong, the timing of the discharge may support the establishment of a causal nexus. See Dey v. Colt Constr. & Dev. Co., 28 F.3d 1446, 1458 (7th Cir. 1994). In Dey, we noted that "a plaintiff may establish [a causal] link through evidence that the [adverse action] took place on the heels of protected activity." Id. In the present case, there was no dispute that Worth was terminated the morning after filing her police report. Such proximity supports the jury's determination of a causal nexus. See id. Therefore, Worth succeeded in establishing a prima facie case of retaliatory discharge under Title VII.

Defendants assert that they rebutted Worth's prima facie case by producing a non-discriminatory reason (poor job performance) for terminating Worth. See Miller, 203 F.3d at 1007. Worth responds that such justification was pretextual. See id. A plaintiff can establish pretext either directly, with evidence suggesting that retaliation was the most likely motive for the termination, or indirectly, by showing that the employer's proffered reason was not worthy of belief. See Johnson v. Sullivan, 945 F.2d 976, 980 n.5 (7th Cir. 1991) (quotation omitted). "The indirect method requires some showing that (1) the defendant's explanation has no basis in fact, or (2) the explanation was not the real reason, or (3) . . . the reason stated was insufficient to warrant the termination." See Sanchez v. Henderson, 188 F.3d 740, 746 (7th Cir. 1999) (quotation omitted).

Tyer testified that he had decided to terminate Worth on June 13, 1994--before Worth filed her police report. Tyer testified that he based his decision to fire Worth on the fact that the flyer and cover letter that Worth worked on contained multiple errors including improper letterhead. On appeal, defendants also contend that Worth could

have been fired because Worth was absent from work without authorization on June 15, 1994.

Worth asserts that there is direct evidence of pretext in this case. Tyer testified that he had been interviewed by Detective Salemas on June 16, 1994. Worth testified that later that day, Tyer justified her firing "in light of recent circumstances." According to Worth, the "circumstances" to which Tyer alluded concerned her filing of the police report--an event about which Tyer learned only hours before firing her. Worth contends that Tyer's admission directly shows that his justification was pretextual. See Schreiner v. Caterpillar, Inc., 250 F.3d 1096, 1100 (7th Cir. 2001) (suggesting admission shows pretext).

Worth also contends there was circumstantial evidence showing that Tyer's justification was pretextual because it was not credible. Initially, Worth asserts that because Tyer was not credible witness, the jury was entitled to disregard his justification. Worth was able to show, and have Tyer admit, that in his initial answer to the complaint, as well as two amended answers, Tyer had denied ever touching Worth in any regard. Tyer then admitted that these answers were lies and that it was only thirteen days before trial that he amended his answer to reflect the truth. Further, Tyer also admitted lying to Detective Salemas when he was first questioned about the alleged battery.

Worth then points to evidence supporting the conclusion that her work was satisfactory. Tyer's previous testimony stated that he based Worth's dismissal "in large part" on using incorrect letterhead. However, Tyer admitted that another employee had used the wrong letterhead for a period of three years without being terminated. Although Tyer asserted that Worth was fired for mistakes in the flyer and cover letter including improper letterhead, he admitted that he had authorized a similar flyer including a similar letterhead approximately four months earlier.

The jury was presented with conflicting stories: either that Worth was fired for reporting Tyer to the police or that she was fired for poor work product and being

absent from work without permission. A rational juror could have believed that termination "in light of recent circumstances" meant that Worth was fired for reporting Tyer to the police and that any post-termination justification was pretextual. See id. Moreover, based on Tyer's dishonest behavior in this case, the jury was entitled to conclude that Tyer's justification was not credible. See Johnson, 945 F.2d at 980 n.5. Thus, the jury's finding that Worth was fired in retaliation for reporting Tyer to the police was not clearly erroneous. See Emmel v. Coca-Cola Bottling, 95 F.3d 627, 629 (7th Cir. 1996); Anderson v. City of Bessemer, 470 U.S. 564, 574, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."). Therefore, the district court did not err in denying defendants' motion for JMOL or for a new trial.

c.  Hostile Work Environment

Defendants next contend that the district court erred in not granting their motions for JMOL or, in the alternative, for a new trial because the evidence at trial was insufficient to establish actionable sexual harassment under Title VII. Sexual harassment is actionable under Title VII only when it is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Meritor Sav. Bank v. Vinson, 477 U.S. 57, 67, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986) (quotation omitted). Whether harassment rises to this level depends on the totality of the circumstances including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993). "The work environment cannot be described as 'hostile' for purposes of Title VII unless a reasonable person would find it offensive and the plaintiff actually perceived it as such." See Hostetler, 218 F.3d at 807.

Worth contends the Morris Office was

hostile on June 13, 1994 and on June 14, 1994. We first address the subjective prong because if Worth did not find the work environment hostile, we must dismiss this claim. See Dey, 28 F.3d at 1454. We can, however, dispose of this prong quickly because there is ample evidence to conclude that Worth perceived her work environment to be hostile. Worth testified her contact with Tyer on June 13 and 14 made her uncomfortable. Moreover, Worth testified that after the June 14, 1994 incident, she was unable to concentrate or work. She then reported Tyer's conduct to the police. These actions show Worth's concern over Tyer's actions and an unwillingness to tolerate further harassment. See Hostetler, 218 F.3d at 807. Therefore, the district court did not err in concluding that Worth found the work environment hostile. See id.

Whether Worth's work environment objectively could be described as hostile "should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998). As we have previously observed:

Drawing the line [between vulgar behavior and sexually harassing behavior] is not always easy. On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers. We spoke [previously] of "the line that separates the merely vulgar and mildly offensive from the deeply offensive and sexually harassing." It is not a bright line, obviously, this line between a merely unpleasant working environment on the one hand and a hostile or deeply repugnant one on the other.

Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430-31 (7th Cir. 1995) (citations omitted) (emphasis added). In the present case, we must determine whether Tyer's conduct over the two-day period was so severe that a reasonable person would have considered Worth's work

environment hostile. See Hostetler, 218 F.3d at 807.

There is no minimum number of incidents required to establish a hostile work environment. See id. at 808. That is because "harassment need not be both severe and pervasive to impose liability; one or the other will do." Id. Indeed, we have often recognized that even one act of harassment will suffice if it is egregious. See id. (listing cases). The fact that conduct that involves touching as opposed to verbal behavior increases the severity of the situation. See id. More importantly, in the present case, of the several touching incidents, one involved Tyer touching an intimate body part--Worth's breast. We have previously recognized that direct contact with an intimate body part constitutes one of the most severe forms of sexual harassment. See DiCenso v. Cisneros, 96 F.3d 1004, 1009 (7th Cir. 1996) (holding conduct not severe because, among other things, defendant "did not touch an intimate body part"); see also Hostetler, 218 F.3d at 808-09. That the touching in this case lasted for several seconds also increases its severity. Cf. Adusumilli v. City of Chicago, 164 F.3d 353, 362 (7th Cir. 1998) (holding that brief touch not severe). Based on the totality of the circumstances, see Harris, 510 U.S. at 23, there was sufficient evidence to conclude that Tyer's conduct was severe. See Smith v. Sheahan, 189 F.3d 529, 533 (7th Cir. 1999).

Defendants cite Adusumilli, 164 F.3d 353, in support of its position that the conduct at issue was not severe. In Adusumilli, we noted that there exists a "safe harbor for employers in cases in which the alleged harassing conduct is too tepid or intermittent or equivocal to make a reasonable person believe" the environment was hostile. 164 F.3d at 362 (quotation omitted). However, contrary to defendants' assertions, the conduct at issue here is neither "tepid" nor "equivocal." Rather, a supervisor touching one's breast near the nipple for several seconds is severe enough to remove such conduct from any safe harbor. See DiCenso, 96 F.3d at 1009; Hostetler, 218 F.3d at 809. Therefore, we cannot conclude that the district court erred in concluding that Worth's work environment was hostile.

D.  Damages and Fees

   Defendants argue that although the jury's finding of Title VII liability means that the award of some compensatory damages was appropriate, $20,000 for retaliatory discharge and $2,500 for sexual harassment was excessive. The district court upheld the damage awards against a post-trial challenge. We review the district court's refusal to grant a new trial on the grounds of excessive damages for an abuse of discretion. See AIC Sec., 55 F.3d at 1285. We make three inquiries when reviewing a compensatory damages award: whether the award is "monstrously excessive"; whether a rational connection exists between the award and the evidence, and "whether the award is roughly comparable to awards made in similar cases." Id.

   The district court found that there was a rational connection between the evidence and the damage awards, and we agree. For all counts, Worth claimed emotional damages. Only for the retaliatory discharge claim did Worth also claim compensatory damages including lost wages and benefits, and expenses associated with finding future employment. The injuries Worth suffered-- lack of sleep, humiliation, distress, lost wages, etc.--were significant enough to warrant the jury's award. Therefore, a rational connection between the respective awards and the evidence existed. Defendants attempt to minimize the conduct by claiming that Tyer lacked "harassing intent" and by commending Tyer for "not proposition[ing]" Worth. However, our analysis focuses on compensating Worth, not on examining Tyer. Moreover, we have previously upheld much larger awards in similar cases. See, e.g., AIC Sec., 55 F.3d at 1286 (listing cases). Finally, the awards of $20,000 and $2,500 cannot be described as "monstrous" or "excessive." Id. at 1285 n.13.

   Next, defendants challenge the battery damage award of $50,000./6 As we discussed, Worth claimed emotional damages and we find that the district court did not err in finding a rational connection between the award and the damage. Moreover, comparable cases indicate similar awards, see, e.g.,

Barrios v. Kody Marine, Inc., 2000 WL 775067, at *5 (E.D. La. June 14, 2001) ($40,000 for, inter alia, touching buttocks and genitalia); Troutt v. Charcoal Steak House, Inc., 835 F. Supp. 899, 900 (W.D. Va. 1993) ($25,000), aff'd, 37 F.3d 1495 (4th Cir. 1994), and we cannot describe the award of $50,000 as "monstrous" or "excessive." See AIC Sec., 55 F.3d at 1285 n.13.

Defendants next contend that the district court abused its discretion in denying their motion for a new trial because the punitive damage awards were excessive. "We will set aside a jury's award of punitive damages only if we are certain it exceeds what is necessary to serve the objectives of deterrence and punishment." Id. at 1287. We do not find the award of $5,000 for sexual harassment, $25,000 for retaliatory discharge, or the $50,000 punitive award for battery to be excessive. The punitive awards barely exceed the amount of compensatory damages for the respective claims. Although not definitive, such a result is relevant. See id. Furthermore, all three awards are consistent with awards we have upheld in the past. See id. (listing cases). Finally, we note that Tyer's actions in this case support such awards as he lied to the plaintiff and the court for over three years before finally admitting the truth thirteen days before trial.

Defendants' final contention is that the district court erred in awarding Worth attorney's fees under 42 U.S.C. sec. 2000e-5(k) because Worth was not a prevailing party. Defendants' argument is without merit as Worth prevailed on significant issues in the litigation. See, e.g., Hensley v. Eckerhart, 461 U.S. 424, 433, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983).

III.  Conclusion

We REVERSE the district court on the Title VII claims against Tyer in his individual capacity and against U.S. Title Co., CTS, and Title Express. We AFFIRM the district court in all other respects. Therefore, in accordance with the forgoing analysis, Ogle II and Grundy II are liable for $20,000 for compensatory damages and $25,000 for punitive damages for the retaliatory

discharge claim, $2,500 for compensatory damages and $5,000 for punitive damages for the sexual harassment claim, and the award of attorneys' fees and costs. Grundy II, U.S. Title Co., CTS, Title Ex press, Ogle II, and Tyer in his individual capacity are liable for $50,000 in compensatory damages and $50,000 in punitive damages for the battery. Therefore, the judgment heretofore entered is ordered VACATED and this case is REMANDED to the district court for entry of judgment consistent with this opinion.

FOOTNOTES

/1 The four-factor test focuses on interrelation of operations, common management, centralized con- trol of labor relations and personnel, and common ownership. See Rogers, 7 F.3d at 582.

/2 We note that Tyer is an attorney admitted to the Illinois Bar and filed his own briefs in this appeal.

/3 The evidence indicated that Tyer was not the controlling shareholder. In disposing of the "alter ego" theory, however, we assume that he was.

/4 Defendants also contend that Worth waived any challenge to the standard of review. However, the court, not the parties, must determine the stan- dard of review, and therefore, it cannot be waived. See, e.g., Vizcaino v. Microsoft Corp., 120 F.3d 1006, 1022 n.4 (9th Cir. 1997) (en banc) (O'Scannlain, J., concurring in part and dissent- ing in part).

/5 According to Webster's Third New International Dictionary "free lance" in this context means "one who pursues a profession or occupation . . . under no long-term contractual commitments to any one employer or company." Webster's Third New Int'l Dictionary 906 (1986).

/6 Judgment was entered against U.S. Title Co., Grundy II, CTS, Title Express, Ogle II and Tyer for the battery. Defendants challenge only the damages award and not the imposition of liabili- ty.