NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued June 13, 2012
Decided June 20, 2012

**Before**

RICHARD D. CUDAHY, *Circuit Judge*

DIANE P. WOOD, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

| | |
|---|---|
| No. 11-2403 | |
| | Appeal from the United States District |
| JOYCINTH V. JONES, | Court for the Northern District of Indiana, |
| *Plaintiff-Appellant*, | Fort Wayne Division. |
| | |
| *v.* | No. 1:09-CV-284 WCL |
| | |
| A.W. HOLDINGS LLC, a/k/a | William C. Lee, |
| ANTHONY WAYNE SERVICES, | *Judge*. |
| *Defendant-Appellee*. | |

**O R D E R**

Joycinth Jones, proceeding pro se, appeals the grant of summary judgment in favor of A.W. Holdings LLC (referred to as "AWS" by both parties) dismissing her claims that the company fired her because she is black and also because she complained about a supervisor's racial bias. The district court rejected her Title VII claim because she was an independent contractor and not an employee of AWS. The court rejected her discrimination and retaliation claims under 42 U.S.C. § 1981 because she failed to show that she was fired because of her race or in retaliation for complaining about workplace racial discrimination. We affirm the judgment.

The following events are recounted in the light most favorable to Jones, though the facts are largely undisputed. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). Jones, a Jamaican native, obtained a master's degree in psychology in 1985 and later a certificate in

substance-abuse counseling, and has worked for many years in the field of social psychology. She was hired as a behavioral clinician for AWS sometime in early 2007 after an introductory phone call with Tom Titus, Director of Behavioral Services, and an interview with Titus's supervisor. AWS is a private company that provides a wide range of services for people with disabilities, including home healthcare. *See* http://www.awsusa.com/aws/services/services.asp (last visited May 30, 2012). As a clinician, Jones would visit disabled adults at home for at least an hour each week and develop behavioral plans for them, under the supervision of a psychologist or psychiatrist.

Jones began working for AWS without a written employment contract with the expectation that the company would pass along client referrals and forward her résumé to case managers to generate additional referrals; she would receive a percentage of the money Medicaid provided for each client's behavioral services. According to Titus, most of the referrals are generated by the behavioral clinicians themselves. In addition to her work for AWS, Jones continued working as a part-time therapist at a group home.

Soon after Jones started at AWS, problems arose regarding her referrals and clinical paperwork. By the summer of 2007, Jones had completed an orientation with AWS and received three or four referrals, but she thought she should be receiving more and asked Titus to send her résumé to case managers throughout Indiana. Instead of doing so, he sent her an outdated, "jumbled" list of case managers to contact herself. She says that Titus's supervisor "expressed surprise" that Titus gave her this list and promised to send an updated one, but never did. In midsummer Jones also began asking Titus for access to the company's intranet, which a fellow clinician told her posted AWS's standard clinical forms, including forms for creating behavioral plans and monthly progress notes. Jones explains that although Titus told her to use her own forms, she wanted to compare hers to the company standards. She claims that when she persisted in requesting access to these forms, Titus inexplicitly threatened to fire her, but his supervisor intervened and forestalled any action from being taken.

In September 2007 Jones finally signed an "independent contractor agreement" with AWS. In this agreement Jones agreed that she would "not be considered an employee of AWS," and the company agreed not to "exercise control or discretion over the manner or methods" in which she provided services. Either party could terminate the agreement without penalty upon 30 days' notice. Consistent with this agreement, AWS reported Jones's income on IRS Form 1099 as "nonemployee compensation," and there were no withholdings from her pay for benefits or taxes.

Shortly after signing this agreement, Jones began working under the supervision of psychologist Scott Salon. Dr. Salon told her that her paperwork was unacceptable and gave

her the name of another clinician whose forms she could look at as examples. Three months later Jones complained to Titus that Dr. Salon was disrespectful and that she suspected he had a hostile attitude toward her because she is a minority. Around this same time, Jones received sample forms from the clinician Dr. Salon had recommended. She claims that the clinician told her that the company's normal practice is to provide these forms to clinicians right after they are hired. Titus also eventually sent her the sample clinical forms.

Two months after complaining about Dr. Salon (and about a year after she started as a clinician at AWS) Jones received a termination letter from Titus. The letter did not explain why she was being fired but simply informed her that in accordance with the independent contractor agreement, she had 30 days to notify her clients of her termination. Jones completed her last 30 days at AWS without incident.

Jones then sued AWS under Title VII and § 1981, claiming that the company had treated her—the only black behavioral clinician out of six—differently than similarly situated coworkers, all of whom were promptly given written employment contracts and copies of the company's standard clinical forms. She contended that she was terminated because of her race and also in retaliation for her complaint about Dr. Salon. Finally, she claimed she was fired because she is Jamaican; she later abandoned this claim after AWS pointed out that national-origin discrimination is not actionable under § 1981.

AWS moved for summary judgment, explaining that Jones's contract was terminated for two legitimate, nondiscriminatory reasons: She failed to turn in clinical paperwork on time, and clients had complained about her services. The district court granted the motion and entered judgment for AWS. The court first held that Jones was not entitled to relief under Title VII because the plain language of her contract and the nature of her working relationship with AWS established that she was an independent contractor, not an employee. As for the § 1981 claim, the court noted that Jones lacked direct evidence of discrimination and needed to rely on the indirect method of proof. Under that method Jones's claim failed because she had not identified any similarly situated white clinician for comparison purposes, and there was no evidence that AWS's reasons for terminating her contract were pretextual. Finally, the court rejected Jones's retaliation claim under § 1981, reasoning that the two-month delay between her complaint about Dr. Salon and her termination was too long to show retaliation, especially since AWS had legitimate nondiscriminatory reasons for firing her.

On appeal Jones challenges the district court's decision that she was an independent contractor. She argues that the court relied too heavily on the terms of the independent contractor agreement. She notes, among other things, that she worked for five months

without a contract and that AWS exerted "extreme control" over her job performance by requiring her to work with Dr. Salon and complete "regimented and demanding training."

To determine whether Jones was an employee or an independent contractor, we apply the general principles of agency, looking to several factors, the most important of which is the employer's right to control the agent's actions. *See Worth v. Tyer*, 276 F.3d 249, 263 (7th Cir. 2001); *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 378 (7th Cir. 1991). We agree with the district court that although AWS reviewed Jones's paperwork and provided *some* supervision, these facts were not enough to establish that she was an employee. *See Knight*, 950 F.2d at 380 (affirming worker's status as independent contractor despite company training). Rather, as the district court noted, the terms of her contract and the circumstances of her relationship with AWS confirm that she was an independent contractor. In particular, Jones maintained substantial flexibility in scheduling, conducting client visits, and recommending treatments, all of which suggests a significant degree of independence and a lack of control by AWS. *See Ost v. W. Suburban Travelers Limousine, Inc.*, 88 F.3d 435, 438–39 (7th Cir. 1996); *Murray v. Principal Fin. Grp., Inc.*, 613 F.3d 943, 946 (9th Cir. 2010); *Ernster v. Luxco, Inc.*, 596 F.3d 1000, 1006–07 (8th Cir. 2010); *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 180–81 (3d Cir. 2009). She was not formally trained by AWS but, rather, obtained specialized education and professional clinical training long before affiliating with the company. *See Worth*, 276 F.3d at 263; *Weary v. Cochran*, 377 F.3d 522, 526–27 (6th Cir. 2004); *Aymes v. Bonelli*, 980 F.2d 857, 862 (2d Cir. 1992). She held another part-time job with a different company while under contract with AWS, *see Kirk v. Harter*, 188 F.3d 1005, 1008 (8th Cir. 1999), and her relationship with AWS could be terminated without cause under her contract upon 30 days' notice, *see Hayden v. La-Z-Boy Chair Co.*, 9 F.3d 617, 622 (7th Cir. 1993). Importantly, Jones received her entire pay as "nonemployee compensation," reported on IRS Form 1099 without employee benefits or tax deductions. *See Taylor v. ADS, Inc.*, 327 F.3d 579, 581 (7th Cir. 2003); *Lerohl v. Friends of Minn. Sinfonia*, 322 F.3d 486, 492 (8th Cir. 2003); *Kirk*, 188 F.3d at 1008; *Aymes*, 980 F.2d at 862–63. Finally, the language of her independent contractor agreement specifically stated that she was not an employee of AWS; though not dispositive, this strongly reflects that the parties intended Jones to work as an independent contractor. *See Taylor*, 327 F.3d at 581; *Brown*, 581 F.3d at 181; *Adcock v. Chrysler Corp.*, 166 F.3d 1290, 1293 (9th Cir. 1999); *Spirides v. Reinhardt*, 613 F.2d 826, 832–33 & n.30 (D.C. Cir. 1979).

Although her independent-contractor status defeats her Title VII claim, Jones may still proceed on her claims of discrimination and retaliation under § 1981, which is not limited to employees. *See Taylor*, 327 F.3d at 581–82; *Brown*, 581 F.3d at 181; *Webster v. Fulton Cnty., Ga.*, 283 F.3d 1254, 1257 (11th Cir. 2002). The analysis for these claims is the same as it would be under Title VII. *See Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011) (discrimination); *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009) (retaliation). Jones first

argues that she produced enough circumstantial evidence to raise an inference of discrimination under both the direct and indirect methods of proof. She emphasizes that she was the only black clinician at AWS and that Titus delayed giving her a written agreement and copies of the company's standard clinical forms. She also notes that she received only meager referrals and an outdated list of case managers, and that Titus refused to remove her from a "hostile" working relationship with Dr. Salon.

This evidence is insufficient to establish a triable § 1981 claim under the direct method of proof because it does not point directly to any discriminatory reason for her discharge. *See Dass v. Chi. Bd. of Educ.*, 675 F.3d 1060, 1071 (7th Cir. 2012); *Rodgers v. White*, 657 F.3d 511, 516–17 (7th Cir. 2011). Nor does it establish a prima facie case of discrimination under the indirect method. *See Rodgers*, 657 F.3d at 517; *Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 730 (7th Cir. 2011); *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 940 (7th Cir. 2003). Titus provided two nondiscriminatory reasons for terminating Jones's contract: She submitted late paperwork and clients complained about her work. Because Jones did not show that any white coworker had a comparable set of failings, she did not establish a prima facie case. *See Harris v. Warrick Cnty. Sheriff's Dep't*, 666 F.3d 444, 449 (7th Cir. 2012); *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 642–43 (7th Cir. 2008). Moreover, she produced no evidence tending to show that the proffered reasons for her discharge were lies and therefore did not establish pretext. *See Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 396–97 (7th Cir. 2010); *Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 478–79 (7th Cir. 2010). Her claim is further undermined by our general skepticism toward claims of discriminatory discharge where the same person—here Titus—participated in both the worker's hiring and firing. *See Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 747 (7th Cir. 2002).

Jones does identify a potential problem with Titus's explanation for her discharge: AWS did not submit Titus's affidavit until it filed its reply brief on summary judgment. We have questioned the credibility of an explanation submitted at so late a stage in the litigation if it conflicts with an explanation provided earlier. *See Zaccagnini v. Charles Levy Circulating Co.*, 338 F.3d 672, 677–78 (7th Cir. 2003). But the late explanation does not raise the usual adverse credibility inference here. First, the inference drawn in *Zaccagnini* is not as strong where, as here, the defendant does not give "shifting" justifications but instead offers an initially sparse explanation that later is more fully substantiated. *See Poer v. Astrue*, 606 F.3d 433, 441–42 (7th Cir. 2010). Moreover, Jones could have moved to strike this affidavit or file a surreply, but did not. *See Broaddus v. Shields*, 665 F.3d 846, 855 n.3 (7th Cir. 2011).

Jones also challenges the district court's conclusion that she failed to prove retaliation under the direct method of proof. She reiterates her argument that she was fired "on the heels" of her complaint about Dr. Salon. But the termination came *two months* after her complaint, and we have repeatedly stated that a two-month gap between protected

activity and an adverse job action is too long to support a claim of retaliation absent other evidence. *See Turner v. The Saloon, Ltd.*, 595 F.3d 679, 690 (7th Cir. 2010) (two months); *Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) (seven weeks); *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 665 (7th Cir. 2006) (two months); *EEOC v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 952–53 (7th Cir. 2001) (en banc) (six weeks). Jones has no other evidence suggesting that she was terminated in retaliation for complaining about Dr. Salon.

Finally, Jones indicated in her notice of appeal that she challenges the denial of her postjudgment motion for relief. But she never squarely addressed this issue in her brief. Moreover, the postjudgment motion was based on a claim of "new" evidence: That AWS employed her in a second job as a direct-care worker, replaced her with a white clinician, and reassured her that her untimely paperwork would not be a problem. The district court properly concluded that neither Rule 59(e) nor Rule 60(b) of the Federal Rules of Civil Procedure allows for postjudgment relief based on evidence that could have been presented before judgment was entered. *See Obriecht v. Raemisch*, 517 F.3d 489, 494 (7th Cir. 2008); *Rutledge v. United States*, 230 F.3d 1041, 1052 (7th Cir. 2000).

**AFFIRMED**.