# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 08-1957

KATHERINE WEBER,

*Plaintiff-Appellant,*

*v.*

UNIVERSITIES RESEARCH ASSOCIATION, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:05-cv-05607—**Wayne R. Andersen**, *Judge.*

ARGUED DECEMBER 2, 2009—DECIDED SEPTEMBER 2, 2010

Before BAUER, KANNE, and TINDER, *Circuit Judges.*

KANNE, *Circuit Judge.* Katherine Weber sued her former employer, Universities Research Association, Inc. ("URA"), for sex discrimination and retaliation in violation of Title VII. The district court granted URA's motion for summary judgment on both claims. We affirm.

**I. BACKGROUND**

URA hired Weber as a mechanical engineer in 1986. During the early 1990s Weber was the target of sexual harassment. The perpetrators of the harassment were never identified, and the harassment stopped when she was transferred to a new department where she no longer worked as an engineer. In 1996, Weber returned to the department where she had been harassed, this time as group leader of a computerized maintenance system called CMMS. She told Dianne Engram, URA's Equal Employment Opportunity Officer, that she was reluctant to return to the department. Fritz Lange, who at the time of the earlier harassment was Weber's peer, was now her boss. He told her that she had "better be good" and that he did not want any trouble from her. Later, Weber started reporting to Dave Augustine, a technician, who had previously been one of Weber's subordinates. The chain of command at this time was as follows: Weber reported to Augustine, who reported to Lange, who reported to Paul Czarapata, who reported to Roger Dixon.

In 2003 Augustine gave Weber a negative performance review. She complained to Engram because she believed Augustine had failed to properly fill out the goals section of her review. Engram suggested Weber file a grievance. Weber filed a level 2 grievance with Dixon, who forwarded the grievance to Czarapata. Czarapata twice told Weber to file a level 1 grievance directly with her supervisor, as required by URA policy. Weber did not allege in any of her grievances that Augustine's review of her performance was discriminatory. Weber

won her grievance in February 2004, and the negative review was removed from her file. Her final performance review for 2003 was "satisfactory."

After she filed her grievances, Weber alleges that a number of bad things started to happen to her at work. Augustine sought to reclassify Weber as a computer specialist rather than as a mechanical engineer—she had in fact done no engineering work since 1996 when she took over CMMS. Czarapata and Juanita Frazier, Employee Relations Manager, started investigating the viability of CMMS. Czarapata says that he began to consider shutting down CMMS due to budget issues some time after approving the contract for 2004 but before learning about Weber's filed grievances. The log book for CMMS showed that Weber only accessed CMMS once per week. Czarapata eventually decided to stop using CMMS and eliminate Weber's position. It appears from the record that Frazier was responsible for getting clearance from the Department of Energy to lay off Weber. Lange and Czarapata informed Weber that URA was discontinuing the use of CMMS and that her position was being eliminated.

Rather than fire Weber, Czarapata and Lange offered Weber a choice of two positions: one working in building management, which could have required shift work, and the other working as an Engineer II and reporting to Christine Ader, who was also an Engineer II. Weber told Czarapata that she would take the engineer job with Ader because she could not do shift work. Weber looked for other positions within URA, but never found another position to which she could transfer.

Ader and Weber's relationship got off to a rocky start. According to Ader, the two met on March 8, 2004, to discuss Weber's first job assignment: to replace and motorize a kick stand. On March 15, Ader went with Weber to the P-bar area of the accelerator to give her further instructions on the assignment. Weber took approved sick leave from March 17 through March 19. Weber did not complete the assignment on time, and Ader did it herself. When Weber returned from her sick leave, Ader gave Weber an official reprimand for insubordination for having failed to complete the assignment given to her. Weber denies that Ader ever gave her the assignment. Ader had in fact submitted a request on March 10 for a drafter to work on the same assignment.

After Weber's return to work, Ader asked her about her sick leave, told Weber to turn off her lights when she left for the day, requested her work and lunch schedules, and asked to know the layout of the furniture in her office, which she shared with another employee. Weber sent a note to Engram complaining that she was being retaliated against, but Engram did not interpret the note as lodging a formal complaint of retaliation. Weber also sent an email to Engram complaining that Ader did not "check up" on other employees like she did on Weber. On one occasion Ader denied Weber's request for sick leave. Later, when Weber again requested sick leave, Ader sent an email to Czarapata in which she said she was "ready for the next round."

Ader noticed that Weber spent a great deal of time at her computer but still did not finish all of the work as-

signed to her. Ader told this to Czarapata, and Czarapata decided to trace Weber's Internet usage for five workdays. The results of the trace show that Weber spent more than 16 hours in one week on the Internet visiting websites unrelated to her job, including accessing two personal email accounts and a number of dog-related sites.

URA did not produce the actual amount of time spent on non-work-related websites during discovery, but the total time was before the district court when it ruled on URA's motion for summary judgment. Based on the results of the trace the network manager for the accelerator division concluded that Weber was using her work computer for personal business matters. Ader investigated further and discovered a number of advertisements for Weber's dog training business in which Weber listed her two personal email accounts as contacts. Ader also found another listing for Weber's business that listed Weber's URA work phone number as the contact number.

Weber does not deny that she accessed her personal email accounts or visited the dog-related sites, but she claims that she did so for personal reasons. Weber also says that the amount of time spent on the websites can be explained by her leaving a browser open to a website while she worked, though the trace did show that Weber's use of the websites was interactive.

URA has a policy that requires those employees who have outside employment to file a form with URA and get authorization for the outside employment. The policy says that unauthorized outside employment may

be grounds for firing the violating employee. URA's policy on computing specifically forbids conducting outside employment on URA equipment. The computing policy does allow for some personal use of the Internet by its employees. Weber did not file an outside employment form.

Ader and Frazier concluded that Weber had used URA's computers to conduct her personal outside business in violation of URA policy and that she should therefore be fired. Lange drafted a letter of termination for Dixon's approval, and Weber was suspended pending Dixon's decision. Weber responded in writing to Dixon alleging that her dog-training business was in fact a hobby rather than a business. She denied conducting any personal business on URA time, and alleged that a number of male employees also conducted outside business while at URA but were not disciplined.

Weber identified eight men who she alleges conducted outside business at URA. Further, two men had viewed pornography on URA computers; one was officially reprimanded, but neither was fired. Weber identified several others who had outside employment but had not filled out the required outside employment form. Based on Weber's allegations, URA investigated a number of male employees, including tracing the Internet activities of several men. Two men accessed websites that could relate to their outside employment; for example, a musician accessed a music-related website. None of the men identified by Weber were disciplined or terminated. Weber challenges the adequacy of URA's investigation.

On July 2, 2004, Dixon decided to terminate Weber for conducting an outside business without authorization and for using URA computers in furtherance of that business in violation of URA policy. Weber sued URA under Title VII for discrimination and retaliation. The district court granted URA's motion for summary judgment on all claims, and Weber appealed.

## II. ANALYSIS

We review the district court's grant of summary judgment *de novo*. *Tindle v. Pulte Home Corp.*, 607 F.3d 494, 496 (7th Cir. 2010). We view the evidence in the light most favorable to Weber, the non-moving party, and give her the benefit of all reasonable inferences from the evidence. *Id*.

### A. Waiver

A plaintiff asserting a claim of discrimination or retaliation under Title VII may choose to prove her case under either the direct or indirect method. *Poer v. Asrtue*, 606 F.3d 433, 439 (7th Cir. 2010). The district court found that Weber did not attempt to present any direct evidence of discrimination or retaliation, so the court analyzed the sufficiency of Weber's evidence only under the indirect method of proof. *Weber v. Univ. Research Ass'n, Inc.*, No. 05 C 5607, 2008 WL 818268, at *2-3 (N.D. Ill. Mar. 20, 2008).

Weber argues on appeal, however, that she did in fact produce evidence sufficient to survive summary

judgment under both the direct and indirect methods. URA for its part sides with the district court, arguing that she has waived the direct method of proof by failing to develop that argument in the district court. *See Bus. Sys. Eng'g, Inc. v. Int'l Bus. Mach. Corp.*, 547 F.3d 882, 889 n.3 (7th Cir. 2008) ("Arguments not raised before the district court are waived on appeal." (internal quotation marks omitted)).

After reviewing Weber's submissions to the district court opposing URA's motion for summary judgment, we find that Weber indeed failed to sufficiently raise the direct method of proof to preserve the issue for appeal. A single sentence that mentions a theory of direct proof—suspicious timing[1]—is not enough to preserve the issue for appeal, especially where Weber apparently did nothing more to indicate to the district court that she was pursuing the direct method of establishing her retaliation claim. Because we find that Weber has waived her discrimination and retaliation arguments under the

---

[1] Although suspicious timing is often used as direct evidence, Weber's "direct" theory relies heavily on inferences from circumstantial evidence that belong more properly in the indirect method of proof. *See Elkhatib v. Dunkin Donuts, Inc.*, 493 F.3d 827, 829 (7th Cir. 2007) ("Direct evidence is evidence that, if believed, shows discriminatory conduct by the employer without reliance on inference or presumption, such as where there is an admission by an employer that the decision was based on the prohibited animus. That may include circumstantial evidence, but such evidence must point directly to a discriminatory reason for the employer's action." (citation and internal quotation marks omitted)).

direct method of proof, we do not address these argu-
ments on appeal. Weber does not argue on appeal her
retaliation claim under the indirect method, so the only
claim left for us to consider is her discrimination claim
under the indirect method of proof.[2]

### B. Discrimination

Under the indirect method of proof, Weber must estab-
lish a prima facie case of sex discrimination by pro-
ducing competent evidence that (1) she is a woman,
(2) she suffered an adverse employment action, (3) she
was meeting URA's legitimate business expectations,
and (4) a similarly situated man was treated more favor-
ably. *See LaFary v. Rogers Group, Inc.*, 591 F.3d 903,
907 (7th Cir. 2010). If she establishes a prima facie
case, the burden shifts to URA to show a legitimate,
non-discriminatory reason for firing her. Weber must
then show that URA's proffered reason is simply pre-

---

[2] URA argues that Weber should also be precluded from
pursuing her indirect theory of sex discrimination because it
is outside the administrative charge. When Weber filed
her first charge with the Equal Employment Opportunity
Commission after being suspended pending termination, she
indicated that she was complaining of both sex discrimination
and retaliation. After she was terminated, she filed a second
charge in which she identified retaliation as the only ground
for her claim. Because we find that Weber's sex discrimina-
tion claim fails as a matter of law, we need not decide whether
it falls outside the administrative charge.

text and that her gender was the real reason she was fired. *Id.*

The district court found that Weber failed to establish a prima facie case of sex discrimination because there was no question that Weber failed to meet URA's business expectations: Weber owned a dog-training business, she was aware of the requirement to get URA's approval for conducting an outside business, she failed to submit the required form, she was aware of the policy prohibiting the use of URA computers to conduct outside business, and she spent a significant amount of time over a five-day period accessing dog-related websites and personal email addresses that she used in her dog-training business. The district court also found that even if she did not conduct outside business on the computers, spending more than 16 hours in one week on websites for personal use was an unreasonable use of the computer for personal reasons. The district court also rejected Weber's argument that she was meeting URA's expectations because her past performance reviews were satisfactory; the plaintiff bears the burden of showing that she was meeting her employer's expectations *at the time* of the adverse action,[3]

---

[3] The only adverse actions that Weber suffered were being placed on suspension pending termination and being terminated. Although Weber argues that her transfer to the Engineer II position working under Ader (also an Engineer II) was a demotion and therefore an adverse action, there is no evidence in the record from which we can infer that this transfer decreased her salary, gave her an inferior title, changed her

(continued...)

*see Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 788 (7th Cir. 2007). Weber cannot meet this burden.

Weber now argues that she does not have to show that she was meeting URA's expectations as long as she can show that similarly situated men were punished less harshly. *See Pantoja v. Am. NTN Bearing Mfg. Corp.*, 495 F.3d 840, 846 (7th Cir. 2007); *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002) ("When a plaintiff produces evidence sufficient to raise an inference that an employer applied its legitimate employment expectations in a disparate manner . . ., the second and fourth prongs of *McDonnell Douglas* merge—allowing the plaintiff to establish a prima facie case, stave off summary judgment for the time being, and proceed to the pretext inquiry."). Because Weber has at least raised the issue that some of her male coworkers also violated URA's outside employment and computing policies but were not disciplined or fired, we will merge the second and fourth prongs of the *McDonnell Douglas* test.

Even if Weber does not have to show that she was meeting URA's legitimate business expectations, we conclude that URA is still entitled to summary judgment because Weber has failed to show that there were similarly situated men who were treated more favorably than she was. Although "the similarly situated co-worker inquiry is a search for a substantially similar

---

[3] (...continued)
benefits, or diminished her responsibilities. *See Oest v. Illinois Dept. of Corr.*, 240 F.3d 605, 612-13 (7th Cir. 2001).

employee, not for a clone[,]" *Chaney v. Plainfield Healthcare Ctr.*, ___ F.3d ___, No. 09-3661, 2010 WL 2813644, at *8 (7th Cir. July 20, 2010), in disciplinary cases a plaintiff must show that "the two employees dealt with the same supervisor, were subject to the same standards, *and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.*" *Peele*, 288 F.3d at 330 (*quoting Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000)).

Weber identified a number of male URA employees that had outside employment, conducted personal business while at URA, viewed pornography on URA computers, or viewed websites that could have been related to their outside employment. She argues that all of these men are similarly situated to her because they were all subject to the same outside employment and computing policies. Although Weber has produced evidence that her male coworkers violated URA policy and were not fired, she has not satisfied her burden to show that any of those men were similarly situated with regard to her. Specifically, although she has identified a number of policy violations, she has not produced evidence that any of the men had trouble finishing their work because of the violations or that any of them violated URA's policy with the same reckless abandon. Even if downloading music files is on par with looking up dog-related websites, downloading one music file is a far cry from spending more than 16 hours in one week on myriad websites related to an outside business. The

fact that she accessed personal email addresses that were listed as contact emails for her business serves to further distinguish her violations of company policy from those of her male coworkers.

Likewise, the men who viewed pornography at work are not similarly situated. There is no evidence that either man spent anywhere near the amount of time that Weber did on non-URA related websites. Furthermore, URA could reasonably view using company resources to further an outside business as more offensive to the company's policy than simply wasting company time.

None of the men that Weber identified as comparators violated URA's policy to the degree that Weber did; Weber thus cannot show that there are similarly situated men who were treated more favorably. Weber has failed to establish a prima facie case of discrimination. We also agree with the district court that Weber failed to show that URA's stated reason for terminating Weber was pretextual, but we need not address that issue in detail because Weber failed to satisfy her initial burden with respect to her claims.

## III. CONCLUSION

The district court's grant of URA's motion for summary judgment is AFFIRMED.