In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-1500

RONALD BATES,

*Plaintiff-Appellant,*

*v.*

CITY OF CHICAGO, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 05 C 1564 — **James B. Zagel**, *Judge.*

ARGUED JANUARY 24, 2013 — DECIDE AUGUST 9, 2013

Before MANION and WOOD, *Circuit Judges,* and BARKER,
*District Judge.*\*

---

\* Honorable Sarah Evans Barker, District Judge for the Southern District of
Indiana, sitting by designation.

MANION, *Circuit Judge.* Ronald Bates, a black firefighter with the Chicago Fire Department, was demoted one level from his at-will position as a District Chief to a Deputy District Chief position. The Fire Commissioner who demoted him and the firefighter who replaced him were also black. Nonetheless, Bates claims that his demotion was based on racial discrimination. The district court dismissed several of Bates's claims under Federal Rule of Civil Procedure 12(b)(6), then granted summary judgment against him on the remaining claims. We affirm.

## I. Facts

Ronald Bates is a black firefighter who joined the Chicago Fire Department in 1977 and gradually rose through the ranks. He was promoted to Lieutenant in 1980, Captain in 1987, Battalion Chief in 1989, and Deputy District Chief in 1998. In 2000, Fire Commissioner James Joyce appointed Bates to one of seven District Chief positions in the Chicago Fire Department. A District Chief is a member of the Fire Commissioner's personnel management team and holds an at-will position with no expectation of continued employment. During Bates's tenure as a District Chief, Joyce had no complaints about Bates's job performance. Indeed, Bates instituted a diversity program in his district and was involved in a training program for newly appointed chiefs, and his work appears to have been well received within the Chicago Fire Department.

But Joyce resigned as Fire Commissioner in 2004, and Cortez Trotter became the new Fire Commissioner. Trotter, like Bates, is black. Trotter chose his own management team, and on May 24, 2004, he issued a personnel order that contained a

list of thirty promotions, demotions, and lateral reassignments for at-will positions in the Chicago Fire Department.[1] These appointments consisted of eighteen promotions (eight black, ten non-black); eight demotions (three black, five non-black); and four lateral reassignments (two black, two non-black).[2]

Bates was one of the demotions. Trotter demoted him to a Deputy District Chief position in Operation Relief, which is a floating assignment not associated with any particular district. Among the seven District Chiefs, Bates was the only one demoted. The other six District Chiefs were either promoted (one black, four non-black) or laterally reassigned (one non-black).

Trotter promoted Nicholas Russell to Bates's District Chief position, and like Bates and Trotter, Russell was also black. Russell had started working with the Chicago Fire Department just a few years after Trotter began working there, and Russell had been a Battalion Chief when Trotter promoted him to Bates's District Chief position. Significantly, Russell had been the president of the African American Firefighters League for more than a decade, and had led protests against racial discrimination within the Chicago Fire Department during that time. Overall, Trotter's new appointments to the District Chief

---

[1]   The order initially contained a list of thirty-one appointments, but an addendum dated May 26, 2004, deleted a name from the list.

[2]  The district court's opinion and the briefs contain minor discrepancies in these numbers, but these discrepancies are not significant enough to affect the outcome of this appeal.

positions increased the number of black firefighters serving as District Chiefs from two to three.

Bates worked in his new Deputy District Chief position for a few months, then took a year-long medical leave. At the end of his leave, Bates was unable to continue his work, and he retired from the Chicago Fire Department on November 13, 2005. On March 16, 2005, during his medical leave, Bates filed a pro se complaint, which he subsequently amended with the assistance of counsel on September 27, 2005. The amended complaint contained four counts alleging that Bates's demotion had been motivated by racial discrimination. It named Joyce, Trotter, and two District Chiefs as defendants in their individual capacities and as agents of the City of Chicago in their official capacities. Bates sued Trotter because Trotter had made the decision to demote him, and Bates also sued Joyce and two District Chiefs because they had allegedly influenced Trotter's decision. Count I was a Title VII claim against the City of Chicago, Count II was a § 1983 claim against all defendants, Count III was a § 1981 claim against the individual defendants, and Count IV was a state law claim for intentional infliction of emotional distress against all defendants.

The district court ultimately resolved all counts in favor of the defendants. The court dismissed Counts II and III under Federal Rule of Civil Procedure 12(b)(6) for all defendants except Trotter, and dismissed Count IV for all defendants. The court allowed discovery for the remaining counts, then entered summary judgment on Count I in favor of the City of Chicago (the only defendant named in that count) and on Counts II and III in favor of Trotter (the only defendant remaining in those counts). Bates filed a timely appeal of these rulings.

## II. Discussion

We first examine whether the district court erred in granting summary judgment on Count I in favor of the City of Chicago and on Counts II and III in favor of Trotter. We then examine whether the district court erred in dismissing Counts II and III against the other defendants under Rule 12(b)(6).[3]

### A. Claims Resolved on Summary Judgment

Bates alleges that Trotter and the City of Chicago demoted him because of racial discrimination that violated Title VII (Count I), § 1983 (Count II), and § 1981 (Count III). The district court granted summary judgment on these claims in favor of the defendants. We review a district court's grant of a motion for summary judgment de novo, and we view all facts and inferences in favor of the non-moving party (here, Bates). *Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 673 (7th Cir. 2012).

Bates argues that he has presented sufficient evidence of racial discrimination to survive summary judgment under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).[4] Under the *McDonnell Douglas* framework, "a plaintiff must produce evidence that he (1) belongs to a protected class, (2) met his employer's legitimate performance expectations, (3)

---

[3]    Bates does not contest the district court's dismissal of Count IV.

[4]    Even though Bates was replaced by another black firefighter, that fact is not dispositive, and we must still analyze Bates's arguments through the *McDonnell Douglas* framework. *See Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 158-59 (7th Cir. 1996) (per curiam) ("An employee may be able to show that his race … tipped the scales against him, without regard to the demographic characteristics of his replacement.").

suffered an adverse employment action, and (4) was treated worse than similarly situated employees outside the protected class." *Rodgers v. White*, 657 F.3d 511, 517 (7th Cir. 2011). If the plaintiff satisfies these requirements, the burden shifts to the defendant to offer a legitimate, non-discriminatory reason for the employment action. *Id*. And if the defendant offers such a reason, the burden shifts back to the plaintiff to show that the defendant's reason was merely a pretext. *Id*. The *McDonnell Douglas* framework applies equally to claims under Title VII, § 1983, and § 1981. *Id.*

The district court concluded that Bates could not establish a prima facie case because he failed to prove the fourth *McDonnell Douglas* element: whether Bates was treated worse than similarly situated firefighters who were not black. We have held that "[t]he similarly situated inquiry is a flexible, common-sense one that asks, at bottom, whether 'there are enough common factors … to allow for a meaningful comparison in order to divine whether intentional discrimination was at play.'" *Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007) (quoting *Barricks v. Eli Lilly & Co.*, 481 F.3d 556, 560 (7th Cir. 2007)). "[T]he comparator must still be similar enough 'to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel, [so as to] isolate the critical independent variable: complaints about discrimination.'" *Filar v. Bd. of Educ. of Chi.*, 526 F.3d 1054, 1061 (7th Cir. 2008) (quoting *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007)).

We agree with the district court that Bates failed to prove the "similarly situated" element because "the numbers do not

support the claim of race discrimination." Across the board, Trotter's promotions, demotions, and lateral transfers did not demonstrate any clear racial bias. Of the eight demotions, five were for non-black firefighters, which suggests that Trotter demoted both black and non-black firefighters without regard to race. Bates therefore lacks evidence that he was treated worse than similarly situated firefighters. *See Bush v. Commonwealth Edison Co.*, 990 F.2d 928, 931 (7th Cir. 1993) ("[A] pattern, in which blacks sometimes do better than whites and sometimes do worse, being random with respect to race, is not evidence of racial discrimination.").

Bates contends that we should limit our "similarly situated" comparison to the appointments of the other six District Chiefs. Of the seven District Chiefs, Bates was the only one demoted. The other six District Chiefs had either been promoted (one black, four non-black) or laterally reassigned (one non-black). But we see no need to exclude Trotter's other appointments from our analysis. Trotter made all thirty appointments in the same personnel order, and they consisted of a comprehensive scheme to change the leadership in the at-will positions within the Chicago Fire Department. And if we were to scrutinize the District Chief comparisons more closely, we would note that the other District Chiefs had qualifications and experiences that distinguished them from Bates. For example, Trotter promoted District Chief James Kehoe to a position that Kehoe had held under a former Commissioner. Bates, however, had never held a rank higher than District Chief. Trotter also promoted District Chief William Donohue because Donohue had demonstrated an aggressive management style while handling a scandal in his district. Bates does not assert that he had similar experi-

ence. Therefore, if we were to closely scrutinize the records and accomplishments of the other District Chiefs, we would still find that Bates is unable to show that he was treated worse than a "similarly situated" group of non-black District Chiefs.

Even if Bates were able to satisfy the "similarly situated" element and establish a prima facie case, Trotter asserted a legitimate, non-discriminatory reason to explain his decision to demote Bates. Trotter testified during a deposition that he had demoted Bates because Bates's management style did not align with his own:

> In looking at the goals and looking at my needs for the Fire Department, specifically [Bates's] District, I felt that the person that I was appointing was better able to carry out my goals and reflect my management style. …
>
> …
>
> … I have an aggressive management style. I look for high energy, enthusiasm. I look for people that are—that appear, at least to me, to be engaged in what they're doing.

When asked specifically about Bates, Trotter testified that he remembered "not being impressed by the overall demeanor or the enthusiasm that I saw." We have readily accepted such concerns about an employee's performance and leadership skills "as legitimate, non-discriminatory reasons; indeed, they are a staple of employer responses in these situations." *Sattar v. Motorola, Inc.*, 138 F.3d 1164, 1170 (7th Cir. 1998).

Bates would then have to show that Trotter's reason for Bates's demotion was merely a pretext. To show pretext, a plaintiff "must identify such weaknesses, implausibilities, inconsistencies, or contradictions in [the defendant's] proffered reasons that a reasonable person could find them unworthy of credence and hence infer that [the defendant] did not act for the asserted non-discriminatory reasons." *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007). A plaintiff can do this by showing that the defendant's reason for the adverse employment action (1) had no basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to motivate the action. *Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1006 (7th Cir. 2002). "The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000).

Bates attempts to establish pretext by arguing that Trotter's reason for his demotion had no basis in fact. First, Bates claims that Trotter changed his reason for the demotion, and Bates argues that this alleged inconsistency demonstrates the unreliability of Trotter's explanation. Bates claims that Trotter testified that Bates was a "good fit" for Trotter's management team in his second deposition, even though Trotter had previously testified that Bates was not a "good fit" in his first deposition. But Trotter's statements did not create an inconsistency in his position; they merely reflected Trotter's desire to keep Bates within his management team, but not at the level of a District Chief. Bates further argues that his work performance and management skills could not have been Trotter's reason for the demotion because, even though Trotter demoted Bates,

Trotter still retained Bates in an at-will position and invited
him to a management retreat. But again, Trotter's actions
simply demonstrated that Trotter wanted to keep Bates in his
management team, but not as a District Chief.

Second, Bates argues that Trotter's reason for his demotion
is based on factual inferences that are impermissible on
summary judgment. Bates cites conflicting evidence in the
record about the extent of his relationship with Trotter, and he
claims that these discrepancies are genuine issues of material
fact that preclude a summary judgment ruling. But any
inconsistencies in the depositions regarding the relationship
between Trotter and Bates are not material to the resolution of
this case. The record established that Trotter and Bates had met
in person at least several times, and they had worked together
in the Chicago Fire Department for decades. Trotter therefore
had sufficient experience with Bates and the Chicago Fire
Department to support his assertion that Bates's demeanor and
level of enthusiasm were not compatible with his management
style.

Finally, Bates argues that we should not infer that Trotter
opposes racial discrimination simply because he is black, and
therefore would not discriminate against another black
firefighter. Although it is possible for employers to discrimi-
nate against members of their own race, Bates provided no
evidence that Trotter was racially biased against black
firefighters. Instead, the record shows that Trotter promoted
many black firefighters to at-will positions in the Chicago Fire
Department. He promoted eight black firefighters in the
personnel order dated May 24, 2004, and he increased the
number of black District Chiefs from two to three. Indeed,

Trotter replaced Bates with Russell, who was also a black firefighter. And not only did Russell and Bates share the same race, Russell had been the president of the African American Firefighters League for more than a decade. Trotter was well aware of Russell's advocacy for the African American Firefighters League, and Trotter and Russell had even been on a television show together and discussed Russell's work against racial discrimination. Russell's activism is likely what Trotter referred to as the "high energy [and] enthusiasm" that the Fire Department needed "to carry out [his] goals and reflect [his] management style." Therefore, we affirm the district court's ruling that Bates failed to establish a prima facie case, and even if Bates were able to do so, he would be unable to show that Trotter's reason for Bates's demotion was merely pretext.

### B. Dismissed Claims

Bates further alleges that "Trotter was influenced by" Joyce and two District Chiefs, and that Trotter demoted Bates as a result of this influence. The amended complaint therefore named Joyce and the two District Chiefs as defendants to the § 1983 claim (Count II) and the § 1981 claim (Count III). The district court dismissed these claims against Joyce and the two District Chiefs under Federal Rule of Civil Procedure 12(b)(6) because it concluded that these defendants were entitled to qualified immunity from a "cat's paw" theory of liability.

But Bates denies that he is invoking the "cat's paw" theory of liability. The amended complaint, however, specifically alleged that "Trotter was influenced by" Joyce and two District Chiefs, which is a classic example of a "cat's paw" theory of

liability. Joyce and the two District Chiefs lacked the authority to demote Bates on their own, and the amended complaint even conceded that only "Defendant Trotter made the decision to demote Bates." Therefore, the amended complaint alleged a theory of "cat's paw" liability, but Bates has since waived that theory.[5]

On appeal, Bates seems to frame his argument as one of direct liability, in which Joyce and the two District Chiefs were "actively involved" in Bates's demotion. This hardly helps his case. Even if these were the allegations in the amended complaint (which they were not), we would find that the amended complaint failed to specifically allege how Joyce and the two District Chiefs were "actively involved" in Trotter's decision to demote Bates. The amended complaint was vague, never explained its case, and lumped the defendants together without sufficient detail.

---

[5] Joyce was the outgoing Fire Commissioner who was replaced by Trotter, and the two District Chiefs were promoted further up into Trotter's management team in the May 24, 2004, personnel order. All three were white. Because of Joyce's experience in managing the Chicago Fire Department, and the policy-making roles of the two promoted District Chiefs, we assume that Trotter would naturally have considered the advice of these defendants (among others) as a necessary part of reorganizing the Department. But Bates alleges that this advice was based not on the defendants' professional judgment, but on the defendants' alleged racial biases. The amended complaint made nothing but vague and generalized allegations about the racial attitudes of these defendants, and failed to make any specific allegations about how racism was the basis for any advice these defendants gave to Trotter.

But even if Bates had not waived his claims against Joyce and the two District Chiefs, and even if the district court had erred by dismissing the § 1983 and § 1981 claims against them because of qualified immunity, such an error would be harmless under Federal Rule of Civil Procedure 61. The § 1983 and § 1981 claims proceeded to summary judgment against Trotter, and as discussed in Section II.A, Trotter asserted a legitimate, non-discriminatory reason that explained his decision to demote Bates. Trotter testified in his deposition that his decision was based on his own goals and management style, and he gave no indication that he had received any racially motivated advice from Joyce or the two District Chiefs.

### III. Conclusion

The district court correctly determined that Bates was unable to establish a prima facie case under the *McDonnell Douglas* framework, and even if he could establish such a case, Bates would be unable to show that Trotter's reason for Bates's demotion was merely pretext. Additionally, the district court correctly dismissed the § 1983 and § 1981 claims against Joyce and the two District Chiefs for allegedly influencing Trotter's decision to demote Bates. We therefore AFFIRM the district court's rulings.